IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KOBRE & KIM LLP,<br><br>    Plaintiff,<br><br>- v. -<br><br>COMMODITY FUTURES TRADING COMMISSION,<br><br>    Defendant. | INDEX NO. 19-cv-10151 |

## COMPLAINT

**1.** Plaintiff Kobre & Kim LLP ("Plaintiff" or "Kobre & Kim") brings this action against the Commodity Futures Trading Commission ("CFTC" or "Commission") for unlawfully withholding documents subject to disclosure under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

### NATURE OF THE ACTION

#### Introduction

**2.** This FOIA Complaint seeks documents concerning the CFTC's unprecedented "gag" settlement in the landmark case, *U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, Case No. 15-cv-2881 (N.D. Ill.) (hereafter, "*Kraft*"). The documents in Plaintiff's original FOIA request will shed light on a question of great public interest: why did the CFTC, the nation's principal regulator of commodities and derivatives markets, try to conceal the factual and legal bases for its litigation settlement with Kraft Foods Group Inc. and Mondelēz Global LLC (collectively, "Kraft") and agree never to discuss that settlement in public? At least two

Commissioners publicly disavowed the CFTC's decision to keep silent on the settlement, and the public deserves to understand the full story behind these extraordinary events.

3. To date, the CFTC has refused to even respond to Kobre & Kim's FOIA request, thus signaling that it intends to double down on its original inclination to keep the circumstances surrounding its settlement with Kraft under a veil of secrecy, even to the point of disregarding federal law.

4. The CFTC's secret settlement in the *Kraft* case, like its handling of other recent market manipulation cases, is a disservice to the industry the CFTC oversees. It is just the latest example of the CFTC obfuscating the law on market manipulation by pressing legal theories that are inconsistent with what the courts have articulated and using its leverage to secure private settlements purportedly validating the CFTC's own theories.

5. To this point, the CFTC has left the public in the dark about how the CFTC applied its anti-manipulation authority to a fact pattern it litigated for over four years. Beyond seeding concerns across the industry over arbitrary enforcement, the CFTC's actions threaten to chill legitimate market behavior while failing to deter potential misconduct in the future. Unless and until the CFTC provides a full accounting of the attempted *Kraft* settlement, the public cannot have reasonable confidence that the agency is discharging its core mission of fostering open, transparent, and competitive markets.

## Summary

6. *Kraft* was the first litigated case brought by the CFTC under Section 6(c)(1) of the Commodity Exchange Act ("CEA"), as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"),[1] and implementing Rule 180.1.[2] The commodities and

---

[1] 7 U.S.C. § 9(1).
[2] 17 C.F.R. § 180.1.

derivatives trading industry, as well as legal practitioners in the field, have been closely monitoring the *Kraft* case for guidance about how the CFTC would interpret and apply this new legal authority.

7. The *Kraft* case took on heightened importance following the CFTC's loss in another market manipulation case, *U.S. Commodity Futures Trading Comm'n v. DRW Investments, LLC*, Case No. 13-cv-7884 (RJS) (S.D.N.Y.), in November 2018. Following a bench trial in the *DRW* case, Judge Sullivan rejected the CFTC's theory of manipulation, stating that it was "only the CFTC's Enforcement Division that has persisted in its cry of market manipulation, based on little more than an 'earth is flat'-style conviction that such manipulation must have happened because the market remained illiquid." 2018 WL 6322024, at *21. The CFTC subsequently declined to appeal Judge Sullivan's decision in *DRW*.

8. Following the Court's rejection of the CFTC's manipulation theory in *DRW*, the industry was at a loss regarding what the CFTC would (or would not) deem to be manipulation in the future. Many in the industry were looking to the *Kraft* case for that guidance.

9. The CFTC responded to its defeat in *DRW* by further obscuring the law, abandoning its four-year litigation against Kraft in favor of a settlement in which the CFTC made no public findings of fact or conclusions of law. Worse, the CFTC agreed as part of the settlement not to make any public statements about the case in the future, ensuring that large swaths of the rationale for the settlement would remain insulated from public oversight. In effect, the CFTC negotiated a private resolution that left the industry without any intelligible guidance and with a potential misimpression that the legal theories asserted against *Kraft* had a sound legal basis.

10. Two of the CFTC's own Commissioners swiftly spoke out against the gag provision in the settlement. On August 15, 2019, the day after the settlement was announced, Commissioners Dan M. Berkovitz and Rostin Behnam issued a joint statement (the "Berkovitz-Behnam

Statement") criticizing the settlement's "unusual features." Recognizing that "CFTC enforcement actions not only punish violations of the law and deter future misconduct by the party to the action, but also provide guidance to the public about the agency's interpretation of its laws," the Commissioners explained that they, "as public officials, ***must be able to explain to Congress and the public*** the basis for the sanctions obtained, as well as the rationale for entering into a settlement agreement rather than pursuing litigation" (emphasis added). This is particularly true "in settlements where there are no evidentiary findings," because "***it is critical that a Commissioner be able to speak*** publicly about his or her reasons for determining that the law has been violated, why the agreed penalties are appropriate, and why the agency did not obtain findings of fact or proceed to trial" (emphasis added). Commissioners Berkovitz and Behnam concluded that "***the public has a right to know*** whether federal agencies are obtaining appropriate remedies when the law is violated" (emphasis added).

**11.** The Commission as a whole also issued its own statement (the "Commission Statement") regarding why it had agreed to a gag provision as part of the *Kraft* settlement. The Commission stated that its decision to approve the settlement "was based on the fact that while this provision . . . limits what *the Commission* . . . can say about the *Kraft* litigation, it *does not restrict individual Commissioners* when speaking in their personal capacities" (emphasis added). Highlighting just how extraordinary the gag provision was, the Commission emphasized that "[w]e do not expect the Commission to agree to similar language in the future[.]" It remains unclear why a gag provision that (a) has no precedent in prior CFTC settlements and (b) apparently will never be repeated again was appropriate for the *Kraft* case.

12. The Berkovitz-Behnam Statement and the Commission Statement are attached to this Complaint as Exhibits A and B, respectively. These Statements were posted to the CFTC's website, along with other press releases discussing the gag settlement, on August 15, 2019.

13. Thereafter, in another bizarre turn of events, the CFTC swiftly scrubbed both the Berkovitz-Behnam Statement and the Commission Statement from its website within hours of their posting, apparently disavowing the Commission's own stated explanation for why it had been willing to accept the gag provision in the first place. As of the date this filing, the circumstances surrounding these Statements, including their posting on the CFTC's website and subsequent deletion, remain shrouded in mystery.

14. The Berkovitz-Behnam Statement and the Commission Statement quickly became the subject of collateral litigation in the U.S. District Court for the Northern District of Illinois, which, in turn, prompted the CFTC to seek the extraordinary relief of a writ of mandamus from the U.S. Court of Appeals for the Seventh Circuit to prevent the District Court from holding an evidentiary hearing on the actions of the CFTC and its Commissioners.

15. Consistent with its secretive approach to resolving the *Kraft* case, the CFTC sought to have its petition before the Seventh Circuit litigated under seal. The Seventh Circuit, however, rejected that sealing application. In an October 22, 2019 Opinion issued by Judge Easterbrook, the Seventh Circuit made clear that it had "ordered all of the papers to be placed in the public record" and emphasized that "a confidentiality clause in [a] litigants' agreement does not authorize secret adjudication."

16. The day after the Seventh Circuit's ruling, the District Court vacated the settlement. Likewise recognizing the importance of transparency, the District Court emphasized that "no secret adjudication has been, or will be, authorized."

17. Ultimately, these unusual proceedings only underscore the pressing need to understand the circumstances surrounding the CFTC's attempted settlement of the *Kraft* case. The Seventh Circuit, the District Court, Commissioners Berkovitz and Behnam, and the Commission itself have now all acknowledged the public's right to know.

18. Plaintiff sent a FOIA request covering these issues to the CFTC on August 21, 2019. A copy of that Request is attached to this Complaint as Exhibit C. The CFTC has not responded to the Request. As such, Kobre & Kim brings this action to enforce its statutory rights under FOIA.

## PARTIES

19. Plaintiff Kobre & Kim LLP is a New York Limited Liability Partnership. Kobre & Kim LLP is a law firm focused on disputes and investigations, with its principal place of business at 800 Third Avenue, New York, New York 10022.

20. Defendant United States Commodity Futures Trading Commission is an agency of the federal government within the meaning of 5 U.S.C. § 551 and 5 U.S.C. § 552(f). The Commission's headquarters are located at 1155 21st Street, NW Washington, D.C. 20581. The Commission's stated mission is to foster open, transparent, and competitive markets. To this end, the Commission is empowered to police certain markets for manipulation, among other trading practices. The Commission has possession and/or control of the records Kobre & Kim seeks.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

22. Venue lies in this district pursuant to 5 U.S.C. § 552(a)(4)(B) because Kobre & Kim has its principal place of business in the Southern District of New York.

23. The Commission failed to meet its statutory duty to respond to Kobre & Kim's FOIA Request within twenty working days. Therefore, Kobre & Kim is entitled to appeal in this Court pursuant to 5 U.S.C. § 552(a)(6)(C).

## FACTS

### The CFTC's (Largely Unsuccessful) Pre-Dodd-Frank Manipulation Results

24. The CFTC has a lengthy history of asserting aggressive market manipulation theories with little to no grounding in the law. Former CFTC Commissioner Bart Chilton complained in 2009 that "in the CFTC's 35-year history we have only successfully prosecuted and won a single case of manipulation in the futures markets."

25. In July 2007, the CFTC filed a market manipulation complaint against Brian Hunter, a natural gas trader at Amaranth Advisors. After seven years of litigation, the CFTC eventually settled its claims against Mr. Hunter without making any findings of fact or conclusions of law. Senators Dianne Feinstein, Maria Cantwell, and Carl Levin responded to the settlement by raising "concerns about whether the CFTC's authority as currently exercised can effectively regulate energy markets."

26. The CFTC's next litigated market-manipulation case was filed in November 2013 against DRW Trading and its founder, Donald Wilson. Following a bench trial in December 2016, Judge Sullivan issued a decision rebuking the Commission and the Enforcement Division for failing to present a coherent theory of artificial price:

> It is not illegal to be smarter than your counterparties in a swap transaction, nor is it improper to understand a financial product better than the people who invented that product. In the summer and fall of 2010, [the Defendant] believed that he comprehended the true value of the Three-Month Contract better than anyone else […]. He didn't need to manipulate the market to capitalize on that superior knowledge, and there is absolutely no evidence to suggest that he ever did so in the months that followed.

> ***It is only the CFTC's Enforcement Division that has persisted in its cry of market manipulation, based on little more than an "earth is flat"-style conviction that such manipulation must have happened*** because the market remained illiquid. Clearly, that is not enough to prove market manipulation or attempted market manipulation, and the CFTC has simply failed to meet its burden on any cause of action.

*See DRW*, No. 13-cv-7884 (RJS), 2018 WL 6322024 at *21 (S.D.N.Y. November 30, 2018) (emphasis added).

27. In the wake of the *DRW* case, industry participants were perplexed about how to distinguish lawful trading from unlawful market manipulation. The CFTC had published no meaningful guidance on the subject and was instead pursuing a "regulation through litigation" strategy. But the CFTC's litigations were not providing meaningful guidance either. To the contrary, the arbitrary and discredited manipulation theories pursued by the CFTC in test cases like *DRW* and *Hunter* were only fueling more confusion.

### The Dodd-Frank Amendments

28. Congress added a new Section 6(c)(1) to the CEA as part of Dodd-Frank in 2010. 7 U.S.C. § 9(1). In introducing the relevant Dodd-Frank amendment, Senator Cantwell complained that "[i]n the 35 years of its history, the CFTC has only successfully prosecuted one single case of manipulation."

29. Section 6(c)(1) now makes it unlawful for "any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of" Commission Regulations.

30. In an effort to implement Section 6(c)(1), the Commission enacted Rule 180.1 in 2011. Rule 180.1 prohibits, in relevant part, "any person, directly or indirectly, in connection with

8

any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud." 17 C.F.R. § 180.1.

31. The Commission has stated that Section 6(c)(1) and Rule 180.1 were intended to "*augment* the Commission's existing authority to prohibit fraud and manipulation." To date, however, the Commission has issued virtually no meaningful guidance about how it intends to interpret and apply these newly "augmented" standards in the context of market manipulation, or how the new standards are different from the old ones. And the Commission has issued no guidance at all since its theories of manipulation and artificial price were rejected in *DRW*.

### The *Kraft* Case

32. The CFTC sued Kraft for market manipulation under Section 6(c)(1) and Rule 180.1 in April 2015. *Kraft* was the CFTC's first litigated case applying these new provisions to allegations of market manipulation.[3] In the absence of other meaningful guidance, the industry was closely monitoring the case for insight about how the CFTC would interpret and apply these new provisions, particularly after the result in the *DRW* case.

33. The legal theory initially advanced by the CFTC in *Kraft* was that Section 6(c)(1) and Rule 180.1 proscribe manipulation even in the absence of fraud. This theory was criticized by the District Court early in the case as essentially nonsensical. In language mirroring the Court in *DRW,* the *Kraft* Court rejected the Commission's assertion of non-fraud based market manipulation under the new rule, describing it as so expansive as to prohibit "something as simple

---

[3] The CFTC recently filed another market manipulation case asserting novel legal theories in September 2019, underscoring the industry's need for notice and guidance in this area.

as 'buy low, sell high' trading based on market trend lines, or any other plan for trading aimed at profit making . . . ***an interpretation prohibiting such activity would be absurd***" (emphasis added).

34. Interest in the *Kraft* case grew acutely after the CFTC's manipulation theory in *DRW* was rejected in late 2018. *Kraft* then became the industry's most likely source of guidance about how the CFTC would apply Section 6(c)(1) and Rule 180.1 in the wake of the *DRW* decision.

35. Yet the CFTC took steps to end the *Kraft* case within weeks of the *DRW* decision. In March 2019, the Commission and Kraft informed the District Court that they had reached a "binding agreement," with all material terms placed on the record. The Court entered a Consent Order for a monetary penalty of US $16 million against Kraft on August 14, 2019. The settlement does not contain any findings of fact or conclusions of law, and there was no public explanation of how this number was reached or why.

36. While the CFTC's sudden willingness to settle the *Kraft* case appears under the circumstances to have been motivated by the Court's rejection of a similar manipulation theory in *DRW*, the CFTC has refused to provide any meaningful explanation or guidance to the public. Instead, the CFTC has sought to further obfuscate the applicable manipulation standards. In the aftermath of the *DRW* decision, CFTC Chairman J. Christopher Giancarlo issued a statement emphasizing that *DRW* involved only "the CFTC's pre-Dodd Frank legal authority," thus implying (without any legal basis) that the current legal standards are different in some unspecified way.

37. The industry remains in the dark as to what legal standards the CFTC applied to Kraft, what facts allegedly met those standards, or why US $16 million was an appropriate monetary penalty. From what little information is available, the CFTC's attempted settlement appears to have been arbitrary.

38. Making matters worse, the *Kraft* settlement purported to impose a gag order provision disallowing the parties from making "any public statement about this case other than to refer to the terms of [the] settlement agreement or public documents filed in [the] case." Thus, the CFTC not only failed to provide meaningful guidance to the industry after four years of litigation, but it actually prohibited itself from doing so. The settlement appears to have been engineered to convey the misimpression that there was a sound legal basis for the CFTC's manipulation theory, even though there was not.

39. On August 15, 2019, the day after the settlement was entered in the *Kraft* case, two Commissioners issued a joint statement regarding the settlement. Among other things, Commissioners Berkovitz and Behnam recognized that it is "critical that a Commissioner be able to speak publicly about his or her reasons for determining that the law has been violated, why the agreed penalties are appropriate, and why the agency did not obtain findings of fact or proceed to trial" because ***"the public has a right to know whether federal agencies are obtaining appropriate remedies"*** (emphasis added).

40. In addition, the Berkovitz-Behnam Statement recognized that the Commissioners have a "statutory right to publicly state their views on matters before the Commission" by virtue of Section 2(a)(10)(C) of the CEA, and that the "Commission cannot bargain this right away in settlement negotiations."

41. While the Commissioners acknowledged that the *Kraft* settlement provided "[no] guidance to the public about the agency's interpretation of its laws," and thus no deterrent guidance for "similar misconduct by others," the Berkovitz-Behnam Statement itself did nothing to remedy that problem.

42. The Commission also felt compelled to defend its opaque settlement in a public statement. In a separate statement posted on August 15, 2019, the Commission admitted that its decision to approve the gag provisions in the settlement "was based on the fact that while this provision . . . limits what *the Commission* . . . can say about the *Kraft* litigation, it *does not restrict individual Commissioners* when speaking in their personal capacities" (emphasis original).

### Kraft Enforces The Gag Provision

43. Notwithstanding the Commission's expressly stated reason for agreeing to the gag provision—that it did not gag the Commissioners themselves—the CFTC deleted the Berkovitz-Behnam Statement and the Commission Statement from its website mere hours after they were initially posted. On information and belief, the CFTC scrubbed these Statements after Kraft objected to them as violating the gag provision. Since then, the Commissioners have been unable or unwilling to make any further public statements about the settlement, leaving the public and the industry to speculate as to what transpired behind the scenes.

44. On August 16, 2019, Kraft filed a motion for contempt for violating the terms of the gag provision, alleging that the CFTC "never intended to comply with the agreement they negotiated [and] engaged in a deliberate, orchestrated effort to violate the Court's Consent Order within minutes of its entry." Kraft further alleged that the CFTC released the statements as part of a "coordinated effort" in order to "accomplish exactly what the CFTC specifically agreed not to do"—to state publicly that the settlement was favorable to the agency, while implying that Defendants had manipulated the market and admitted as much.

45. One day later, the CFTC responded to Kraft's motion, arguing that the CFTC "is *prohibited* from restricting any individual Commissioner from publishing any dissenting,

12

concurring, or other separate opinion in connection with an official publication by the Commission."

46. In an August 19 hearing on Kraft's motion for contempt, the District Court ordered an evidentiary hearing on the motion, since the parties were requesting that the Court make findings of fact. Highlighting the bizarre turn this case had taken, counsel for the CFTC provisionally asserted Fifth Amendment privileges protecting against potential self-incrimination for the Commission and the Commissioners.

47. The CFTC subsequently submitted an emergency motion to vacate the evidentiary hearing, followed by a petition for a writ of mandamus with the Seventh Circuit, arguing, in part, that it was unlawful for the District Court to act as an investigator in an allegation of out-of-court contempt, that the evidentiary hearing would ignore protections for accusations of criminal wrongdoing, and that the Court could not call "high ranking" government officials to testify. On September 26, the Seventh Circuit ordered that the proceedings in the District Court be stayed, pending resolution of the mandamus petition.

48. On October 22, the Seventh Circuit issued a decision highlighting the importance of transparency. The Court determined that the CFTC cannot bar its members from sharing their regulatory reasoning; thus, Commissioners Berkovitz and Behnam are not bound by the gag order. In addition, the Seventh Circuit warned that the mere inclusion of a gag order in a settlement "does not authorize secret adjudication" of the CFTC's manipulation allegations.

49. While the mandamus proceedings answered the questions of whether individual Commissioners are indeed bound by CFTC consent orders and whether the CFTC can enter into settlements negotiating away those rights, the documents released in connection with the mandamus petition do not offer any clarity on the Commission's post-Dodd-Frank market

manipulation standards. In response to the Seventh Circuit's decision, the District Court vacated the settlement in *Kraft*, emphasizing that "no secret adjudication has been, or will be, authorized."

### **The FOIA Request Seeks Information Critical To Public Understanding**

50. The "core purpose" of FOIA is to contribute "*significantly to public understanding of the operations or activities of the government.*" *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 775 (1989) (emphasis original).

51. Based on the current record, the public has virtually no understanding of why the CFTC attempted to settle its case against Kraft after four years of litigation; why it failed to include any findings of fact, conclusions of law, or other meaningful guidance in that settlement; why it agreed to bar itself from explaining the settlement to the public; and why it swiftly deleted public statements about the settlement by the Commission and Commissioners Berkovitz and Behnam, when their ability to discuss the settlement was the sole justification for agreeing to the gag provision in the first place.

52. On August 21, 2019, Kobre & Kim submitted the Request to the Commission's FOIA Compliance Office (the "Office") through Federal Express mail. A true and correct copy of that request is attached to this Complaint as Exhibit C.

53. On August 22, 2019, Kobre & Kim received confirmation from Federal Express that the Request was delivered to the Office. A true and correct copy of the Federal Express notice of receipt is attached to this Complaint as Exhibit D.

54. The Request seeks the following categories of documents:

   1) All documents and communications concerning the "binding agreement" referenced in docket entry 302 of the case captioned *Kraft*, Case No. 15-cv-2881 (N.D. Ill.);

   2) All documents and communications concerning the "Consent Order" referenced in docket entries 309 and 310 of the *Kraft* case;

3) All documents and communications concerning the decision by the CFTC and/or any of its staff, agents, and/or commissioners to approve the Consent Order;

4) All documents and communications concerning the decision by the CFTC and/or any of its staff, agents, and/or commissioners to approve the Consent Order without findings of fact or conclusions of law;

5) All documents and communications concerning the decision by the CFTC and/or any of its staff, agents, and/or commissioners to approve the provision in the Consent Order that states: "Neither party shall make any public statement about this case other than to refer to the terms of this settlement agreement or public documents filed in this case, except any party may take any lawful position in any legal proceeding, testimony, or by court order";

6) All documents and communications concerning the preparation by the CFTC and/or any of its staff, agents, and/or commissioners of the press releases referenced in docket entry 319 of the *Kraft* case;

7) All documents and communications concerning the decision by the CFTC and/or any of its staff, agents, and/or commissioners to publish the press releases referenced in docket entry 319 of the *Kraft* case;

8) All documents and communications concerning the decision by the CFTC and/or any of its staff, agents, and/or commissioners to remove the press releases referenced in docket entry 319 of the *Kraft* case.

**55.** The Commission failed to respond to the Request by September 19, 2019, the twenty working day statutory deadline under 5 U.S.C. § 552(a)(6)(A).

**56.** To date, the Commission still has not responded to the Request. The Commission's failure to respond to the Request within the twenty-day statutory deadline means that Kobre & Kim has constructively exhausted administrative remedies and has a right to seek relief from this Court. 5 U.S.C. § 552(a)(6)(C).

## CAUSES OF ACTION

### COUNT I

**Violation Of FOIA For Failure To Comply With Statutory Deadlines**

57.     Kobre & Kim repeats, realleges, and incorporates the allegations set forth in paragraphs 1-56 as though fully set forth herein.

58.     The Commission is a federal agency subject to FOIA.  5 U.S.C. § 552(f); 5 U.S.C. § 551.

59.     Kobre & Kim's Request properly seeks records within the possession, custody, and/or control of the Commission under FOIA.

60.     The Request complies with all applicable regulations regarding the submission of FOIA requests.

61.     The Commission failed to make a determination with respect to the Request within twenty working days, as mandated by FOIA.  5 U.S.C. §552(a)(6)(A).

62.     Kobre & Kim has and/or is deemed to have exhausted administrative remedies with respect to the Request.

63.     The Commission's failure to make a determination with respect to the Request within the twenty working days as mandated by FOIA is a violation of its statutory obligations.

### COUNT II

**Violation Of FOIA For Failure To Conduct A Reasonable Search**

64.     Kobre & Kim repeats, realleges, and incorporates the allegations set forth in paragraphs 1-63 as though fully set forth herein.

65.     The Commission is a federal agency subject to FOIA.  5 U.S.C. § 552(f); 5 U.S.C. § 551.

66. Kobre & Kim's Request properly seeks records within the possession, custody, and/or control of the Commission under FOIA.

67. The Request complies with all applicable regulations regarding the submission of FOIA requests.

68. The Commission failed to conduct a search reasonably calculated to identify all records responsive to the Request, as required by 5 U.S.C. § 552(a)(3).

69. Kobre & Kim has and/or is deemed to have exhausted administrative remedies with respect to the Request.

70. The Commission's failure to conduct a search reasonably calculated to identify all records responsive to the Request as mandated by FOIA is a violation of its statutory obligations.

### COUNT III

### Violation Of FOIA For Improper Withholding Of Agency Records

71. Kobre & Kim repeats, realleges, and incorporates the allegations set forth in paragraphs 1-70 as though fully set forth herein.

72. The Commission is a federal agency subject to FOIA. 5 U.S.C. § 552(f); 5 U.S.C. § 551.

73. Kobre & Kim's Request properly seeks records within the possession, custody, and/or control of the Commission under FOIA.

74. The Request complies with all applicable regulations regarding the submission of FOIA requests.

75. The Commission has not cited any exemptions to withhold records or portions thereof that are responsive to the Request.

76. The Commission has not identified whether or how disclosure of each of the requested records or portions thereof would foreseeably harm an interest protected by a FOIA exemption and/or why disclosure is prohibited under the law. *See* 5 U.S.C. § 552(a)(8)(A).

77. Records responsive to the Request are not subject to any exemption from disclosure.

78. Kobre & Kim has and/or is deemed to have exhausted administrative remedies with respect to the Request.

79. The Commission's failure to produce records responsive to the Request as mandated by FOIA is a violation of its statutory obligations.

## COUNT IV

**Violation Of FOIA For Failure To Produce Reasonably Segregable Information**

80. Kobre & Kim repeats, realleges, and incorporates the allegations set forth in paragraphs 1-78 as though fully set forth herein.

81. The Commission is a federal agency subject to FOIA. 5 U.S.C. § 552(f); 5 U.S.C. § 551.

82. Kobre & Kim's Request properly seeks records within the possession, custody, and/or control of the Commission under FOIA.

83. The Request complies with all applicable regulations regarding the submission of FOIA requests.

84. The Commission has not cited any exemptions to withhold records or portions thereof that are responsive to the Request.

85. The Commission has not identified whether or how disclosure of each of the requested records or portions thereof would foreseeably harm an interest protected by a FOIA exemption and/or why disclosure is prohibited under the law. *See* 5 U.S.C. § 552(a)(8)(A).

86. Records responsive to the Request are not subject to any exemption from disclosure.

87. To the extent that a FOIA exemption applies to any records responsive to the Request, the Commission was required, but failed, to reasonably segregate and disclose any non-exempt materials in those records.

88. Kobre & Kim has and/or is deemed to have exhausted administrative remedies with respect to the Request.

89. The Commission's failure to reasonably segregate and disclose all non-exempt materials responsive to the Request is a violation of its statutory obligations.

**REQUEST FOR RELIEF**

WHEREFORE, Kobre & Kim respectfully requests this Court:

(1) Order the Commission to immediately process Kobre & Kim's Request;

(2) Order the Commission to conduct searches reasonably calculated to identify all records responsive to Kobre & Kim's Request and demonstrate that it employed search methods reasonably likely to lead to the discovery of all such records;

(3) Declare that Kobre & Kim is entitled to disclosure of the records sought by the Request;

(4) Enjoin the Commission from withholding all records or portions thereof responsive to Kobre & Kim's Request that are not specifically exempt from disclosure under FOIA;

(5)     Order the Commission to produce all records or portions thereof responsive to Kobre & Kim's Request that are not specifically exempt from disclosure under FOIA on an expedited basis by a date certain;

(6)     Order the Commission to produce an index of any responsive records withheld under any claim of exemption;

(7)     Award Kobre & Kim reasonable attorney fees and costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

(8)     Grant such other relief as the Court may deem just and proper.

Dated: October 31, 2019                                         Respectfully submitted,

      S/ Benjamin J.A. Sauter
Benjamin J.A. Sauter
Michael S. Kim
Jonathan D. Cogan

KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: +1 212 488 1200
Benjamin.Sauter@kobrekim.com
Michael.Kim@kobrekim.com
Jonathan.Cogan@kobrekim.com


David H. McGill
Leanne A. Bortner

KOBRE & KIM LLP
1919 M Street, NW
Washington DC 20036
Tel: +1 202 664 1900
David.McGill@kobrekim.com
Leanne.Bortner@kobrekim.com